UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NICOLE KRISTINE THOMPSON,

                    Plaintiff,

                                                    **REPORT AND**
                                                    **RECOMMENDATION**
          v.
                                                    16-CV-00254-LJV-HBS

NANCY A. BERRYHILL,
ACTING COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

## INTRODUCTION

The Hon. Lawrence J. Vilardo referred this case to this Court under 28 U.S.C. §
636(b)(1)(B). (Dkt. No. 13). Pending before the Court are cross-motions for judgment on the
pleadings by plaintiff Nicole Thompson ("Thompson") (Dkt. No. 12) and the defendant
Commissioner of Social Security ("Commissioner") (Dkt. No. 15).

Thompson argues that the Commissioner erred in finding that she is not disabled under
the Social Security Act ("the Act"). Thompson argues that the Commissioner erred in not giving
controlling weight to the opinion of her treating physician, Dr. Edgar Bassig. Thompson also
argues that the Commissioner erred in not resolving a conflict between the Vocational Expert's
("VE") testimony and the Dictionary of Occupational Titles ("DOT"). Finally, Thompson argued
that the Commissioner failed to provide actual reasons for diminishing her credibility.

The Commissioner responds that the decision that Thompson was not disabled is
supported by substantial evidence; that the Administrative Law Judge ("ALJ") properly

discounted Dr. Bassig's opinion; that there was no conflict between the VE's testimony and the DOT; and that the ALJ did properly assess Thompson's credibility.

The Court has deemed the motions submitted on papers under Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons below, the Court respectfully recommends granting the Commissioner's motion and denying Thompson's motion.

## FACTUAL AND PROCEDURAL BACKGROUND

### I) Procedural History

Thompson applied for disability insurance benefits on March 6, 2012, claiming a disability that began on January 18, 2011. [17.] The application was denied on October 18, 2012. [49.][1] Thompson filed a written request for a hearing on November 15, 2012. [59.] ALJ Robert T. Harvey held a hearing on May 1, 2014 with VE Josiah Pearson present and testifying. [513–553.] The ALJ issued a decision on August 5, 2014 finding Thompson not disabled. Specifically, the ALJ found that:

1) The claimant meets the insured status requirements of the Social Security Act through September 30, 2016.

2) The claimant has not engaged in substantial gainful activity since January 18, 2011, the alleged onset date (20 C.F.R. 404.1571 *et seq*., and 416.971 *et seq*.)

3) The claimant has the following severe impairments: discogenic cervical spine, multiple thoracic fractures, migraine headaches, adjustment disorder with mixed anxiety and depression (20 C.F.R. 404.1520(c) and 416.920(c))

---

[1] [49.] refers to Page 49 of the Certified Administrative Record, Dkt. No. 8.

4)  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5)  The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except the claimant has occasional limitations in the ability to bend, climb, stop, squat and kneel, has occasional limitations in the ability to push or pull with the upper extremities and occasional limitations in the ability to reach in all directions, hand, finger and feel with the dominant, right upper extremity, but cannot crawl, cannot climb ropes, ladders or scaffolds, cannot work in areas with unprotected heights, cannot work with heavy, moving or dangerous machinery, cannot work in areas with exposure to cold or dampness, and has occasional limitations in the ability to understand, remember and carry out detailed instructions, and occasional limitations in the ability to make decisions.

6)  The claimant is capable of performing past relevant work as a Mortgage Clerk. This work does not requires the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565 and 416.965).

7)  The claimant has not been under a disability, as defined in the Social Security Act, from January 18, 2011, through the date of this decision (20 C.F.R. 404.120(f) and 416.920(f)). [17–29.]

On February 2, 2016, the Appeals Council denied Thompson's request to review the ALJ's decision. [1.] The ALJ's decision became the final decision of the Commissioner. Thompson filed a Complaint in this Court on March 28, 2016. (Dkt. No. 1).

## II) Factual and Medical Background

### 1) Plaintiff's Background

Nicole Thompson was born on December 23, 1980. [518.] She completed one year of college and has no vocational training. [519.] She worked previously as a customer service representative, a contact representative, and a bankruptcy specialist for a bank. [529–533.]

### 2) Disability Causing Injury, and Treatment

Thompson's injury was sustained on January 18, 2011 when she was involved in a rollover motor vehicle accident. [248.] She was taken to Erie County Medical Center after the accident where she was diagnosed with anterior superior endplate fractures at T6, T9, T10, T11. [395.] She was treated by Dr. Kowalski who instructed her to wear a brace and to continue seeing him for treatment of the injury. [352.]

Thompson continued to see Dr. Kowalski from January 28, 2011 until May 18, 2011. [357.] During the first appointment on January 28, 2011, Thompson rated her average pain between 8 and 10 and reported that the pain was constant and throbbing but became sharp with certain movements. She also reported trouble sleeping because of her pain. [358.] Dr. Kowalski reported that she had excellent overall maintenance of the alignment of the thoracic spine and was neurologically intact. [360.] He advised that she continue to wear her brace full time for three months. [360.] He says that she is temporarily totally disabled, but he expected her fractures to heal well and for her to return to her baseline situation. [360.]

On February 9, 2011, Dr. Kowalski reported that Thompson was still wearing her brace and remained neurologically intact. [362.] He also provided her with the names of local pain doctors. [363.] During her March 16 appointment, Thompson reported doing better overall but also

reported that her pain had spread to her neck and low back. [364.] She also reported that when she took off her brace for a period, she experienced increased pain. [364.] Dr. Kowalski reported that she was doing well and could gradually begin to increase her activities and take off her brace for short periods. He also anticipated allowing her to return to work after her next visit. [365.]

On April 20, 2011, Thompson informed Dr. Kowalski that she had stopped using the brace most of the time. She reported that she had back pain in the morning that went away throughout the day and that her back aches after prolonged activity. [366.] She told Dr. Kowalski that her pain was actually better than it was before the accident. [366.] Dr. Kowalski noted that clinically, her spine fractures were healed. [367.] At her May 18 appointment, Dr. Kowalski told Thompson that she could return to work without restrictions and only needed to see him again as her symptoms warranted. [368.]

### 3) Pain Management Treatment

Thompson met with Dr. Jerry J. Tracy on May 20, 2011 for an evaluation of her thoracic pain after her motor vehicle accident. [371.] She described her pain as chronic, aching and throbbing, with a sharp, stabbing sensation. [371.] She listed Percocet, Robaxin, Lexapro, Trazodone, and Xanax as her current medications. [372.] She reported no side effects from the medications and rated her pain as 6/10. [372.] During her August 31, 2011 appointment with Dr. Tracy, Thompson rated her pain as 5/10 and her functional capacity as moderate to full. She reported that she had returned to work at the IRS, was operating a motor vehicle, and was caring for her small children. [273-74.] Dr. Tracy listed her disability status as temporarily partially disabled of a moderate degree (50%). [276.] On November 23, 2011, Dr. Tracy reported that her fractures were healed, but she was still experiencing pain in the thoracic region. [277.] She rated her pain

as a 7/10 which was not tolerable for her and Dr. Tracy raised her dose of Percocet. [278-79.] He also changed her medications for depression. [279.]

On January 18, 2012, Thompson continued to report pain. She was still working at the IRS and still reported moderate to full functionality. [281-82.] On May 1, 2012, Thompson reported that she had cervical pain that increased with movement of the cervical spine. She also reported that her pain was radiating to her right shoulder. [290.] She described her neck pain as dull, chronic, and achy. [291.] She had stopped working at the IRS, but Dr. Tracy still evaluated her at moderate to full functionality. [291.] He also noted that she had had a CT scan in March of 2012 that showed no abnormalities. [290.]

During her June 29, 2012 appointment Thompson continued to complain of cervical regional pain and radiculopathic features in her right upper extremity. [296.] Dr. Tracy read the report from her appointment with Dr. Fahrbach and noted that she had well preserved alignment of the cervical spine and a possible disk herniation at C5-6. [297.] In a later x-ray of the cervical spine Dr. Fahrbach found a 2 mm C7-T1 spondylolisthesis with flexion and extension motion. [297.] Thompson had also attended physical therapy at Brain and Spine Medical Services at Dr. Fahrbach's recommendation, but she had to stop because the sessions were causing severe migraines. [297.] Dr. Tracy assessed her as having pain in the thoracic spine, cervicalgia, myofascial pain syndrome, anxiety disorder, and depressive disorder. [298.]

Thompson met with Dr. Tracy for the final time on August 14, 2012. She continued to report mechanically driven cervical regional pain and right upper extremity radiculopathic features as well as dull, chronic, achy thoracic regional pain. [300.]

Thompson met with Dr. Singh for the first time on September, 27, 2013. [486.] She told him that she could no longer see her previous pain management doctor because of an insurance issue. [486.] Dr. Singh recorded her chief complaints as neck and low back pain that was increased by prolonged sitting. [486.] She told him that her neck pain spread into her arms, more on the right, and her fingers went numb frequently. [486.] She also reported having difficulty with above shoulder activity on the right and grip strength weakness in both hands. [486.] She told Dr. Singh that she did all of the housework and took care of her children, but said that she had difficulty with those tasks. [486.] On examination he found that she stood with her right shoulder lower than the left and had limited range of motion of the lumbar spine. [486.] She also had tenderness over the thoracic spine and decreased range of motion of the cervical spine as well as impingement signs of the right shoulder. [487.] He also found mild weakness of thumb abduction bilaterally, more on the right and a positive Tinel's sign over the median nerve at both wrists with a positive Phalen's test. [487.] His clinical impression was that she has neck and low back pain and disc degeneration with symptoms of cervical radiculopathy and lumbar radiculopathy. She had carpal tunnel entrapment and impingement at the right shoulder. [487.]

On November 26, 2013, Dr. Singh sent Thompson for an electrodiagnostic consultation. [490-91.] He concluded that she had cervical radiculopathy affecting the right C5-6 myotome and median neuropathy at the right wrtist compatible with carpal tunnel entrapment of mild to moderate degree. [491.] He also stated that the results indicated adequate preservation of motor units and a fair prognosis for improvement with treatment. [491.]

On December 31, 2013 Dr. Singh discussed Thompson's exam results with her. [492.] Her complaints and his impressions were unchanged from their previous appointment. [492.] On March 9, 2014, Thompson reported to Dr. Singh that she was caring for her young children at

home. [494.] Dr. Singh's clinical impression was unchanged from her earlier appointments. [494.]

### 4) Dr. Bassig

Dr. Edgar Bassig is Thompson's primary care physician. They met for the first time after her accident on January 21, 2011. [428.] Dr. Bassig made no findings himself, but noted the injuries she received in the accident. [428.] Thompson met with Dr. Bassig on February 2, 2011 and told him that she was suffering from worsening depression and was experiencing back pain. [429.] On February 21, 2012 Thompson reported that she had fallen down the stairs and hurt her back again and Dr. Bassig sent her for a CT scan. [431.] On March 9, 2012 Dr. Bassig went over the results with Thompson and diagnosed her with neck pain with radiculitis and cervical disc disease. [432.] He referred her to Dr. Fahrbach. [432.] On April 4, 2012 Dr. Bassig noted musculoskeletal and psychiatric abnormalities. [433.]

Thompson met with Nurse Practitioner ("NP") Susan G. Martin on May 1, 2012. [435.] Thompson complained of pain on the right side of her neck that was starting to exacerbate her migraines. [435.] She also reported going to physical therapy which she said helped to temporarily relieve her pain. [435.] During her exam, NP Martin noted that her cervical spine showed abnormalities and she had limited range of motion in her neck for looking to the right side as well as a slight limitation up and down. [435.] During her June 4, 2012 appointment with Dr. Bassig, he noted during his exam that she had abnormal movement of her extremities, abnormalities of her cervical spine, and an symmetrical musculoskeletal abnormality. [438.]

Thompson saw Dr. Bassig on August 6, 2012 for mental health complaints. [440.] He diagnosed her with depression and anxiety as well as intervertebral disc disease. [441.] On

October 2, 2012 she met with NP Martin and complained of a dark mole, depression, and requested a prescription for Chantix to quit smoking. [441.] On November 11, 2012, Dr. Bassig assessed Thompson as having a backache, intervertebral disc degeneration, lumbago, depression, and anxiety. [446.] On June 12, 2013, Thompson told Dr. Bassig that she was no longer seeing Dr. Tracy for pain management because of an insurance issue but had an appointment with Dr. Singh on June 26. [448.] He did not note any musculoskeletal abnormalities, but did diagnose her with herniated intervertebral disc. [448–49.] He also informed her that that was the last month he would fill her pain medications and that she needed to follow up with a pain management doctor. [449.] On March 3, 2014, Dr. Bassig did not note any neurological or musculoskeletal abnormalities. [471.] They did discuss that she was bruising easily. [471.] On March 12, 2014, they again discussed her easy bruising and he referred her to a specialist. [473.]

Dr. Bassig filled out the Functional Capacity Questionnaire on April 30, 2014. [510–11.] He reported that she can only sit, stand, or walk for 30 minutes at a time and over the entire course of an eight-hour work day. [510.] She can continuously lift up to 5 pounds, frequently lift 6 to 10 pounds, and never more than 10 pounds. [510.] She could not use her right hand for simple grasping, pushing, and pulling of arm controls, or fine manipulation. [510.] She was not able to bend, squat, crawl, climb, or reach at all. [510.] She had mild restrictions for being around unprotected heights and moving machinery. [510.] She had moderate restrictions for marked changes in temperature and for driving automotive equipment. [510.] Her pain and medications would frequently significantly impair and/or preclude performance of even simple work tasks. [511.] She would need to lie down for up to three hours beyond normal breaks during a work day in order to relieve pain arising from a documented medical impairment and due to fatigue arising from a documented medical impairment. [511.] She experienced exacerbations of pain symptoms

that would make it impossible to function in a work setting. [511.] Her symptoms would force her to miss four or more days of work a month. [511.] She had been disabled this way for three years. She was disabled from full time employment on a sustained basis. [511.]

### 5) Consultative Appointments

Thompson had a neurological consultation with Dr. John G. Fahrbach on March 28, 2012. [377–78.] Dr. Fahrbach's impression was that Thompson had cervical spondylosis without myelopathy. [377.] She told him that her neck pain dates back to 2010 and has continued since her accident in 2011. [377.] She reported experiencing progressive neck pain, as well as cracking in her neck and numbness in her hands. [377.] She claimed that her hands went numb two to three times a day, she had been dropping things, and she had trouble using her hands for fine motor activities. [377.] She said that she tried medications and rest and nothing she did helped with her pain, which she ranked as an 8 out of 10. [377.] In reviewing the CT scan, Dr. Fahrbach found that her cervical spine demonstrates well preserved alignment and there did appear to be a disc herniation at C5-6, but it was not well visualized on the scan. [378.]

Thompson had a consultative appointment on October 2, 2012 with Dr. Donna Miller. [309.] Dr. Miller listed Thompson's complaints as anxiety, depression, diabetes, scoliosis, neck pain, and migraines. [309.] Dr. Miller went over Thompson's recent medical history including her chronic neck and back pain and the compression fractures in 2011. [309.] At the time, Thompson was taking Cymbalta, Klonopin, Percocet, Robaxin, Trazodone, and Imitrex. [310.] Thompson reported to Dr. Miller that she cooked four times a week, cleaned and did laundry once a week and cared for her children daily. [310.] She also reported showering four to five times a week and dressing daily. [310.] Dr. Miller noted limitations in Thompson's range of movement in her cervical and lumbar spine. [311.] She also noted that Thompson's hand and finger dexterity were

intact and her grip strength was 5/5 bilaterally. [312.] Dr. Miller diagnosed Thompson with chronic neck pain, bulging cervical disc, chronic low back pain, scoliosis, a history of thoracic fracture, diet-controlled diabetes, and migraine headaches. [312.] She opined that Thompson had mild limitations for repetitive heavy lifting, bending, carrying, reaching, pushing, and pulling. [312.]

On October 2, 2012, Thompson also met with Dr. Susan Santarpia for a psychiatric evaluation. [313.] Thompson reported previous difficulty with depression and anxiety secondary to stressors and that she was receiving psychotropic medication. [313.] She disclosed that she had suffered emotional and physical abuse by her father and estranged husband, which she believed led to her initial depressive symptomatology. [314.] She also reported that her chronic pain and physical limitations had exacerbated her depressive symptoms. [314.] She also reported that she experienced anxiety that manifested as excessive apprehension, worry, restlessness, and irritability. [314.] During her examination, Dr. Santarpia found that Thompson's thought processes were coherent and goal directed, her attention and concentration were intact, she was able to understand simple direction and perform simple tasks independently, both her recent and remote memory skills were intact, she was able to maintain a regular schedule, she could learn new tasks, she could deal with stress within normal limits, and her cognitive functioning was within the average range. [314–15.] Dr. Santarpia reported that she was able to take care of her own personal hygiene as well as do light cooking, cleaning, laundry, and shopping, and was able to manage her own money. [315.] She also opined that Thompson had mild limitations in performing complex tasks independently, making appropriate decision, and relating with others. She wrote that the difficulties were caused by fatigue. [315.] Dr. Santarpia wrote that her

prognosis was guarded and that Thompson should continue with her treatment as currently provided. [316.]

Dr. J. Echevarria completed a psychiatric review on October 17, 2012 based off of the medical record. [317-30.] He concluded that Thompson's psychiatric impairment was non-severe. [329.]

### 6) Mental Health Treatment

Thompson had her first appointment with LCSW-R Lucia C. Wronski for counseling on August 13, 2012. Wronski reported her mood as depressed and her GAF score as 41–50. [304.] They discussed her relationship with her family and addressed what she was seeking help for. [304.] On August 21, 2012, Wronski reported her mood as low and her GAF score as 51–60. [305.] They again discussed her issues with her family and other people in her life. They also discussed that she was unable to return to work. [305.]

On August 29, 2012, Thompson cancelled her appointment at the last minute. [306.] On September 4, 2012, her mood was again low and her GAF score was 51–60. She reported that she had been involved in a fight and the other person ended up in the hospital. [307.] She also reported that her issues were creating stress and that she felt very lonely without family support. [307.] On September 13, 2012, she did not show up and did not call until after her appointment. Wronski reported her mood as flat and depressed. [308.]

On October 10, 2012, she reported that she was homeless after she left her uncle's house because of some inappropriate behavior. [348.] She also reported that her depression was worse and that she had difficulties getting up and doing things, but she had to for her children. [348.] On November 7, 2012 she cancelled her appointment because of insurance issues. [349.]

### 7) Plaintiff's Testimony at the ALJ Hearing

At the hearing, Thompson told the ALJ that she experienced neck and low back pain that radiated into her shoulders and arms, mostly on the right side that goes down to her fingers. [520.] She also said that she had migraines and problems with depression and anxiety. [520–21.] She said that her neck pain was constant every day, her upper extremity pain was also constant every day for 75% of the day, her back pain occurred every day for about half the day, and she had a migraine once or twice a month. [522–23.] She also said that her fingers were numb for about 50 to 75% of the day. [524.] She reported constant fatigue and said that she needed to take a half hour or an hour nap every two hours. [525.] She claimed that she experienced near daily panic attacks and said that her depression caused her to not want to leave the house, get dressed, or play with her children, however she was not being treated by a psychiatrist or psychologist. [526–27.]

When asked about her daily activities, Thompson testified that she did not clean, cook, do dishes, do laundry, make beds, take out the trash, do yard work, shop, go to church, visit friends, or have any current hobbies. [533–34.] She said that her boyfriend had to do all of those things for her. [535.] She also reported that she could not dress or bathe herself without any problem. [535.] She also reported that she could not stand or sit for long periods of time and could not reach over her head, hold her arms straight in front of her, push and pull, squat, climb, stoop, bend at the waist, lean forward, or pick small objects off of a table without a problem. [536–37.]

She said that she had difficulty responding to a sudden change in routine or schedule and had difficulties with memory and concentration. [538–39.]

### III) Vocational Testimony

#### 1) Plaintiff's Testimony Regarding her Past Work

Thompson testified as to her past work in four different jobs, as a customer service representative at Key Bank, a sales representative at Intertech Digital Entertainment, a customer service representative at the IRS, and most importantly as it is the past work in issue, a bankruptcy specialist at Bank of America. [529–33.]

She described the bankruptcy specialist position as a sedentary job where she sat for at least six hours in an eight hour day and lifted less than 10 pounds on average. [530.] She worked with people who had filed bankruptcy to help them make arrangements for making payments on their mortgage. [530.] She had to track payments and make sure they were on time, and if they did not make their payments, she had to submit information to the attorneys. [530.]

#### 2) Vocational Expert's Testimony Regarding Past Work

The VE, Josiah Pearson, testified that Thompson's position as a bankruptcy clerk would fall under the mortgage clerk position in the DOT. [546.] He said that the job was DOT 249.362-014 and was a skilled position with an SVP of 5 and a sedentary exertional level. [546.] When the ALJ gave his hypothetical Residual Functional Capacity ("RFC") and asked if Thompson would be able to perform any of her past relevant work "as she performed it" [548.], Pearson said that she could complete the mortgage clerk job with the proposed limitations because the job required limited contact with customers. [549.] However, when the hypothetical was changed to include occasional limitations in the ability to maintain attention and concentration for extended periods of time; perform activities within a schedule; respond to changes in a work setting; and complete

a normal work week or day; Pearson asserted that such limitations would not allow her to complete the mortgage clerk job. [549–50.]

## DISCUSSION

### I) Scope of Review

The only issue to be determined by this Court is whether the ALJ's decision that Thompson was not disabled is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d. Cir. 1991). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

When determining Social Security disability insurance benefits, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

The initial burden of showing that her impairment prevents her from returning to her previous type of employment falls on Thompson. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform." *Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

To determine whether a plaintiff is disabled, an ALJ must employ a five-step inquiry:

1. Whether the plaintiff is currently working;

2. Whether the plaintiff suffers from a severe impairment;

3. Whether the impairment is listed in Appendix 1 of the relevant regulations;

4. Whether the impairment prevents the plaintiff from continuing her past relevant work; and

5. Whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; *Berry, supra*, 675 F.2d at 467. If a plaintiff is either found to be disabled or not disabled at any step in this five-step inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The ALJ, however, has an affirmative duty to develop the record. *Gold v. Secretary*, 463 F.2d 38, 43 (2d Cir. 1972).

To determine whether an admitted impairment prevents a plaintiff from performing her past work, the ALJ is required to review the plaintiff's RFC and the physical and mental requirements of the work she has done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e). The ALJ must then determine the individual's ability to return to her past relevant work in light of her RFC. *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994).

**II) <u>Step One</u>**

The first step of the five step inquiry is undisputed. Both parties agree that Thompson has not engaged in substantial gainful activity from the alleged onset date, January 18, 2011, through the date of the ALJ decision, August 5, 2014. Therefore, the Court finds that substantial evidence supports the ALJ's findings for the first step.

### III)    <u>Step Two</u>

The second step of the five step inquiry is undisputed. Both parties agree that Thompson's severe impairments are discogenic cervical spine, multiple thoracic fractures, migraine headaches, adjustment disorder with mixed anxiety and depression.

### IV)    <u>Step Three</u>

The third step of the five step inquiry is undisputed. Both parties agree that Thompson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Pt.404, Subpt. P, App. 1. Therefore, the Court finds that substantial evidence supports the ALJ's findings for the third step.

### V)  <u>Step Four</u>

The parties diverge at Step Four. They disagree over the RFC, specifically about the ALJ's decision to apply little weight to the opinion of the treating physician, the ALJ's decision that the plaintiff can engage in her past work as a mortgage clerk, and the ALJ's decision to find Thompson's statements as to her own symptoms not fully credible.

#### 1)    <u>Rejection of the Treating Physician's Opinion on the Plaintiff's Ability to Grasp and Perform Fine Manipulation with her Right Hand</u>

The ALJ's decision to give "very little weight" to Dr. Bassig's opinion on the issue of Thompson's ability to grasp or perform fine manipulation with her right hand was supported by substantial evidence and as such will be upheld by this Court. The basic rule when dealing with a treating physician dispute is that deference be given to a treating source's opinion on the nature and severity of a claimant's impairments, however, "the opinion of the treating physician is not afforded controlling weight where … the treating physician issued opinions that are not

consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 31–32 (2d Cir. 2004); 20 C.F.R. § 404.1527(c)(2). The ALJ must also provide "good reasons" for the weight given to the treating physician's opinion. *Halloran*, 362 F.3d at 32–33. If the ALJ fails to explain their reasoning for weighing the opinion of the treating physician in a certain way, the case is subject to remand. *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 2010).

If the ALJ does not give controlling weight to a treating physician's opinion, he is required to consider the following factors: "(1) the length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence in support of the opinion; (4) the opinion's consistency with the record as a whole; (5) whether the opinion is that of a specialist; and (6) any other relevant factors." *Monroe v. Comm'r of Soc. Sec.*, 676 Fed. App'x 5, 7 (2d. Cir. 2017)(summary order); 20 C.F.R. § 404.1527(c).

Additionally, evidence of "internal inconsistencies, and the conflicting opinions of other examining physicians," can be considered substantial evidence in favor of diminishing the weight of a treating source's opinion. *Tricarico v. Colvin*, ___Fed. App'x ___, 2017 WL 902603, at *2 (2d Cir. Mar. 3, 2017); *Monroe*, 676 Fed. App'x at 7–8; *Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir. 1995).

In this case, the ALJ gave a thorough summary of Dr. Bassig's appointments with Thompson and his statements on the Functional Capacity Questionnaire he filled out. [18-20.] He concluded that Dr. Bassig's opinion on the questionnaire should be "given very little weight because such extensive limitations are not supported by Dr. Bassig's examination of March 3, 2014 or by Dr. Miller's report … Dr. Bassig did not identify the impairments causing such extensive limitations

and the restrictions for sitting, standing or walking no more than thirty minutes per day are inconsistent with the claimant's own admitted capabilities." [20.]

It is clear that there are internal inconsistencies between Dr. Bassig's reported findings at his appointments with Thompson and the Functional Capacity Questionnaire he later filled out. Despite seeing Thompson more than a dozen times between the time of her accident and filling out the questionnaire, Dr. Bassig did not once note her having a problem grasping or performing fine manipulation with her right hand. [428–73.] However, when he filled out the Functional Capacity Questionnaire, he wrote that she was not able to use her right hand for simple grasping, pushing, and pulling of arm controls, or fine manipulation. [510.]

Dr. Bassig's opinion is also not consistent with the findings of other doctors who examined Thompson. Thompson attempts to use Dr. Singh's diagnosis of carpal tunnel and cervical radiculopathy as evidence supporting Dr. Bassig's opinion that she was unable to use her right hand. However, in interpreting the EMG he ordered, Dr. Singh found that Thompson had carpal tunnel of a mild to moderate degree and that there was adequate preservation of motor units and a fair prognosis for improvement with treatment, which is not in line with a complete inability to use the hand. [492.]

Additionally, Dr. Miller stated in her report of her consultative appointment with Thompson that Thompson's hand and finger dexterity were intact and her grip strength was 5/5 bilaterally. [312.] Again this, directly contradicts Dr. Bassig's opinion that Thompson had no ability to grasp or perform fine manipulation with her hand.

Thompson also argues that once the ALJ decided not to use Dr. Bassig's opinion about her ability to use her right hand, he no longer had any medical opinion that addressed her ability to do so. She argues that his RFC finding of occasional limitations is based on his own

interpretation of the raw medical evidence. An ALJ is not allowed to make an RFC finding on an issue that is not addressed by the medical reports or is in contrast with what the medical record says. *See McCarthy v. Colvin*, 66 F. Supp. 3d 315, 321–22 (W.D.N.Y. 2014); *Monroe*, 676 Fed. App'x at 8–9; *Kain v. Colvin*, No. 14-CV-650S, 2017 WL 2059806 at *4 (W.D.N.Y. May 15, 2017). However, in this case, Dr. Bassig's opinion was not the only medical opinion dealing with Thompson's ability to use her right hand. Dr. Miller concluded that her hand and finger dexterity were intact and her grip strength was undiminished. [312.] Dr. Singh concluded that her carpal tunnel was only mild to moderate in degree and that she had a good chance of full recovery. [492.] As the ALJ properly diminished the credibility of the treating physician and based his RFC determination on the opinions of other physicians, there is substantial evidence to support his decision.

### 2) Conflict Between the DOT and the ALJ's Finding that Plaintiff Could Perform her Past Work as a Mortgage Clerk

Thompson argues that the ALJ failed to resolve a conflict between the VE's testimony and the DOT. When there is a discrepancy between the DOT and the VE's testimony, the ALJ is required to identify and resolve that conflict before he can rely on that testimony in his decision. Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 at *4 (Dec. 4, 2000); *see, e.g., Spears v. Colvin*, No. 15-CV-6236, 2016 WL 4973890, at *4 (W.D.N.Y. Sep. 19, 2016); *Patti v. Colvin*, No. 13–CV–1123, 2015 WL 114046, at *6 (W.D.N.Y. Jan. 8, 2015); *Pearson v. Colvin*, 810 F.3d 204, 209 (4th Cir. 2015); *Whitehouse v. Colvin*, No. 13–CV–894, 2014 WL 4685187, at * 8 (W.D.N.Y. Sep. 19, 2014).

However, in this case, the VE testified as to Thompson's ability to perform her past work as it was actually performed, not as it is performed nationally, per the DOT. At Step Four, claimants

have the burden to show that they cannot perform their past work as it was actually performed *and* as it is generally performed in the national economy. *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir.1981). If claimants are unable to show that they cannot perform their past work both as it was actually performed and as it is generally performed in the national economy, they fail at Step Four. *Id.* As the VE was testifying about Thompson's ability to complete her past work as actually performed, not as it was carried out generally, the ALJ did not err by failing to address a discrepancy because "[w]hereas the Dictionary describes jobs as they are generally performed, an expert is often called upon to explain the requirements of particular jobs, and as such, his deviations from the Dictionary in such testimony do not actually "conflict" with the Dictionary." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d. Cir. 2003). In fact, the court in *Jasinski* also stated that "we know of no circuits that have found a 'conflict' in a discrepancy between, on the one hand, the expert's description of the job that the claimant actually performed, and the Dictionary's description of the job as it is performed in the national economy." *Id.*

The ALJ specifically asked the VE if Thompson could perform any of her past work, "as she performed it." [548.] He did not ask about her ability to perform the job as described in the DOT. The ALJ did not therefore fail in his duty to resolve disputes between the VE's testimony and the DOT, because the VE never gave any testimony about the DOT description.

Thompson also argued that she was not able to perform her past work as actually performed with the RFC limitations given to her by the ALJ. In the RFC determination, the ALJ listed Thompson's mental impairments as "occasional limitations in the ability to understand, remember and carry out detailed instructions, and occasional limitations in the ability to make decisions." [21.] Thompson argued that the bankruptcy clerk job required her to track which chapter of foreclosure the customer had filed and what type of payment schedules they had, and

she had to submit evidence to attorneys. She argued that these tasks include significant decision making and required her to follow detailed instructions, which someone with her mental limitations could not do. The crux of her argument basically becomes that she disagrees with the VE over his opinion of what someone with her limitations is capable of doing and she believes that the ALJ had the duty to acknowledge that the VE was wrong.

The duty of this Court is to find whether the ALJ's decision is supported by substantial evidence. *Rivera*, 923 F.2d at 967. This is a deferential standard that requires the Court to accept the ALJ's findings, even if the Court does not agree with his conclusions, as long as he carried out an analysis in line with the regulations that was reasonable based on the objective evidence. *Barrett v. Astrue*, No.10-CV-618S, 2012 WL 895961, at *5 (W.D.N.Y. Mar. 15, 2012).

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion,' and accurately reflect the limitations and capabilities of the claimant involved." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d. Cir. 2014); quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983); *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir.1981).

The only evidence from the record as to Thompson's mental limitations was her own testimony at the hearing and her consultative psychiatric appointment with Dr. Santarpia. Dr. Santarpia said Thompson's thought processes were coherent and goal-directed, her attention and concentration were intact, she was able to understand simple direction and perform simple tasks independently, both her recent and remote memory skills were intact, she was able to maintain a regular schedule, she could learn new tasks, she could deal with stress within normal limits, and her cognitive functioning was within the average range. [314–15.] As the VE testimony was supported by Dr. Santarpia's findings and the ALJ decided to find Thompson's statements about

her own symptoms not entirely credible, there was substantial evidence supporting the ALJ's decision about Thompson's ability to complete her past work.

### 3) **Plaintiff's Credibility**

The ALJ's determination that Thompson's description of her own symptoms was "not entirely credible" is supported by substantial evidence. [15.] The ALJ is required to "consider the extent to which his self-reported symptoms could 'reasonably be accepted as consistent with the objective medical evidence and other evidence of record.'" *Tricarico*, 2017 WL 902603, at \*2; quoting *Genier v Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). "[W]hen determining a claimant's [residual functional capacity], the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Rock v. Colvin*, 628 Fed. App'x 1, 3 (2d Cir. 2015)(summary order); quoting *Genier*, 606 F.3d at 49. Inconsistencies between a claimant's statements at the hearing and her previous statements about her symptoms; and between her statements at the hearing and objective medical opinions, is substantial evidence for the ALJ to have found the claimant less than credible. *Rock*, 628 Fed. App'x at 3.

Under the regulations, a two-part test exists to evaluate a claimant's testimony as to her own symptoms. 20 C.F.R. §§ 404.1529 & 416.929; *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 205 (W.D.N.Y. 2005); *see also Hogan v. Astrue*, 491 F. Supp. 2d 347, 352 (W.D.N.Y.2007). "First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the pain or symptoms alleged by the claimant." *Matejka*, 386 F. Supp. 2d at 205. "Second, if the ALJ determines that the claimant is impaired, he then must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms.

If the claimant's statements about his symptoms are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant's credibility." *Id*.

In his analysis, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her statements, "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" [22.]

Under 20 C.F.R. § 416.929(c), when conducting a credibility inquiry the ALJ must consider, "(1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms." *Patti v. Colvin*, 2015 WL 114046 at *8.

The Commissioner clarified that "[t]he reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any

subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p (1996 WL 374186 at *4)[2].

In *Patti v. Colvin*, the case was remanded because "[t]he ALJ found plaintiff's complaints inconsistent with the medical record but failed to engage in any analysis of plaintiff's testimony as required by the regulations. The ALJ engaged in no comparison of plaintiff's statements concerning her subjective complaints with the objective medical evidence in the record and failed to consider any of the relevant factors, or plaintiff's favorable work history." *Patti*, 2015 WL 114046, at *9. The ALJ also failed to properly discredit the Plaintiff when he "simply recited medical evidence in the record without meaningful analysis of how the medical evidence detracted from Plaintiff's credibility." *Cole v. Colvin*, No. 14-CV-6677, 2015 WL 9463200 at *4 (W.D.N.Y. Dec. 28, 2015).

In this case, there are clear inconsistencies between Thompson's statements at her hearing and her statements to her doctors. As late as March 9, 2014, Thompson reported to Dr. Singh that she was taking care of her children at home. [494.] However, less than two months later at the hearing on May 1, 2014, she reported that she was unable to care for her children. [527.] On October 2, 2012, Thompson reported to Dr. Miller that she cooked, cleaned and worked around the house. [310.] That directly contradicts her statements at the ALJ hearing where she testified that she was unable to do any of those things and her boyfriend had to take care of all of them. [533-35.]

---

[2] SSR 96-7p has been replaced by SSR 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, effective March 28, 2016. However, as SSR 96-7p was in effect at the time of the ALJ's decision, that ruling will be used. *Garrett ex rel. Moore v. Barnhart*, 366 F.3d 643, 647 (8th Cir. 2004). ("We apply the rules that were in effect at the time the Commissioner's decision became final."); *Morris v. Barnhardt*, No. 02-CV-0377, 2002 WL 1733804, at n. 9 (S.D.N.Y. July 26, 2002) ("The SSA indicated that it anticipates federal courts to review SSA decisions under the rules in effect at the time of the SSA decision").

As Thompson correctly explained in her memorandum, the ALJ must directly explain why the medical evidence is leading him to diminish the credibility of the claimant. *Cole*, 2015 WL 9463200 at *4; *Patti*, 2015 WL 114046, at *8–9.  She argues that the ALJ did not explicitly analyze how her statements to her doctors and at the hearing contrasted, that he merely summarized the medical record and then summarized her statements at the hearing. While the ALJ did not go through a function-by-function analysis of every complaint she made at the hearing against her earlier statements, he did summarize her medical record in a way that included contradictory statements and he did, on at least one issue, directly discuss a discrepancy between how she described her symptoms and what she said and did about those statements before her hearing. [22-27.] He noted, directly above his statement that her testimony was credible, but not to the extent alleged, that in her testimony at the hearing, she claimed to get frequent severe headaches, but she had sought very little treatment for them. [27.]

This shows that the ALJ did in fact engage in an analysis of why her statements were not credible and did not merely summarize the medical record with no analysis. As such, his decision is supported by substantial evidence and is not subject to remand.

## VI) **Step Five**

As the ALJ found that the plaintiff could engage in her past work, he ended his inquiry at Step Four and did not engage in a Step Five analysis.

### **CONCLUSION**

For the foregoing reasons, this Court respectfully recommends that the Commissioner's motion for judgment on the pleadings (Dkt. No.15) be granted, and that Thompson's motion (Dkt. No. 12) for similar relief be denied in whole.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report and Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report and Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen(14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) of the Federal Rules of Civil Procedure, as well as W.D.N.Y. Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**

**<u>Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.</u>**

SO ORDERED.

       /s Hugh B. Scott
      HONORABLE HUGH B. SCOTT
      UNITED STATES MAGISTRATE JUDGE

DATED: August 1, 2017